IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAVON WILLIAMS,

Plaintiff,

v.

REBECCA YOUNG, NICHOLAS ROEN, BRITTANY HIBMA, SHANE HINTON, BOWYN WILSON and GINA STREHLOW,

Defendants.

OPINION and ORDER

25-cv-252-jdp

---

Javon Williams, proceeding without counsel, is incarcerated at Columbia Correctional Institution. Williams has a long history of mental health problems and self-harm. This case arises from a self-harm incident in August 2024. Williams alleges that prison staff failed to take reasonable measures to prevent him from overdosing, failed to provide proper medical care at the prison, and then delayed sending him for off-site treatment. I granted Williams leave to proceed on Eighth Amendment and state-law negligence claims against five prison officials: correctional officers Young, Roen, and Wilson, Sergeant Hibma, and Captain Hinton. I also granted Williams leave to proceed on Eighth Amendment and state-law negligence claims against Nurse Gina Strehlow, who worked at prison under a contract with a private agency.

Defendants move for summary judgment. Dkt. 81 (Strehlow) and 89 (prison officials). There is a genuine dispute of material fact as to whether the three correctional officers had a reasonable opportunity to prevent Williams from overdosing, so these claims will proceed to trial. As for the sergeant and the captain, however, the undisputed evidence shows that they did not consciously disregard Williams's medical needs and that any delay attributed to their

actions did not worsen Williams's condition or cause additional pain. I will grant summary judgment to Sergeant Hibma and Captain Hinton.

The undisputed evidence also shows that nurse Strehlow did not consciously disregard Williams's medical needs. She relied on the on-call physician's orders for transportation, assessed Williams's condition, and any delay did not worsen Williams's condition. I will therefore grant Strehlow's motion for summary judgment as to the Eighth Amendment claims against her. However, there is a genuine dispute of material fact as to whether Strehlow breached her duty of care as a nurse by failing to provide activated charcoal immediately after the overdose. So, her motion for summary judgment on the negligence claim will be denied.

## PRELIMINARY EVIDENTIARY ISSUES

### A. Spoliation sanctions

I begin with Williams's motion for sanctions for spoliation of evidence. Dkt. 61. Several segments of body-worn camera footage that might have informed the summary judgment decision have not been preserved. Williams contends that defendants intentionally destroyed body-worn camera footage and destroyed the audio component of Captain Hinton's footage. Williams also contends that defendants intentionally failed to preserve portions of Officer Young's body-worn camera footage to hide her response to Williams's overdose.

Following the self-harm incident, Williams made three preservation requests. The first two requests, made the same day, were for some of Officer Young's body-worn camera footage. Williams first asked "what time did our encounter happen/how long? And can you please save/preserve her BWC for that entire incident for future litigation purposes? I think it happened at approx. 7:30 AM on 8-31-24 . . . ." Dkt 61-5 at 4. His second request asked staff

to "save/preserve the BWC of Officer Young at approx. 7:20 am though 7:30 am on 8-31-24." Dkt 61-5 at 3. In the request, Williams describes an incident where Young removed a tether from his wrist. It appears that the requests were answered with one response, which was the preservation of the 7:20 to 7:30 tether interaction Williams described, rather than the overdose, which occurred around 7:45. *See* Dkt. 61-5 at 3–4. The audio of the footage was redacted to protect the privacy rights of other inmates.

Williams's third request asked for "any and all video's/BWC's footages of me being removed from the interview room, assessed by [the Health Services Unit] and transferred to the hospital." He requested that it include "Supervisor Hinton BWC footages from all interactions with me from approx. 8:00 AM – 10:00 AM." Dkt. 61-5 at 4. Defendants state that staff attempted to preserve this footage but found that there was no functional video in the archived folder.

During the litigation of this case, Williams moved to compel discovery of the unredacted video of Young's footage and the unpreserved footage from his third request. Dkt 46. Magistrate Judge Boor ordered the defendants to produce the relevant audio for Young's footage but told Williams she could not compel the defendants to produce evidence that does not exist. Dkt. 61. The defendants did produce the relevant audio of Young's footage. Following the order to compel, Williams moved for spoliation sanctions, and I ordered the state defendants to clarify why Hinton's footage was not preserved. Dkt. 64. The defendants explained that support staff were unable to audit the video file to see who or what caused the video to be deleted. But an IT specialist from the prison was able to recover the video component of Hinton's footage. He could not recover the audio.

I may grant sanctions for spoliation only when a party had a duty to preserve evidence because it knew, or should have known that litigation was imminent, and yet intentionally destroyed those documents in bad faith. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008). Bad faith means that the documents were destroyed for the purpose of hiding adverse information. Williams contends that the footage of him taking pills in front of Young was destroyed intentionally to hide the evidence of Young's disregard. He also contends that the other footage capturing him in the programming cell was corrupted to hide evidence of him becoming unconscious as he waited for transportation.

The evidence does not establish defendants' bad faith. Williams makes conclusory statements that the defendants intentionally hid the evidence, but there is no actual evidence of bad faith. The issue with Young's footage is explainable. The prison staff member responsible for preserving the footage was not involved with Williams's overdose incident. All she knew from the requests was that Williams wanted footage preserved of an interaction between him and Young that occurred around 7:30. That was preserved. It would have been better practice to preserve *all* the related interactions for that day, but not following a best practice is not bad faith. There is no evidence of bad faith with the request for Hinton's video either. On the contrary, prison staff made every effort to recover the video, and the help desk staff were able to recover the video portion of Hinton's footage.

Under Rule 37(e)(1), I may grant some relief even without evidence of bad faith. I may order a remedy no greater than necessary when (1) a party fails to take reasonable steps to preserve electronic information; (2) the party was on notice that the evidence should be preserved; (3) the evidence cannot be recovered or replaced by additional discovery; and (4)

the loss of evidence prejudices the moving party. But without a showing of bad faith, I may not order an adverse inference or enter default judgment.

I conclude that the parties took reasonable steps to preserve the footage from Hinton's body-worn camera, and that the loss of the audio was not prejudicial to Williams. However, as it pertains to Young's body-worn footage, the prison should have known that the overdose incident would likely be the subject of litigation and was obligated to preserve it, even if Williams requested the wrong time. *See Lewis v. McLean*, 864 F.3d 556, 565 (7th Cir. 2019). At this point, the footage cannot be recovered. The state defendants' only explanation is that Williams did not request the correct footage. Without the video, both Williams's and Young's description of events are uncorroborated, which could be prejudicial to Williams.

Because this case will proceed to trial on the claims against Young, an appropriate remedy is to allow Williams to inform the jury about the state defendants' failure to preserve this segment. *See Loop LLC v. CDK Global, LLC,* Case no. 24-cv-571-jdp, 2025 WL 71870, *8 (W.D. Wis. Jan 10, 2025). I will not instruct the jury about what inferences it should draw, but the parties may argue the matter to the jury.

**B. Williams's motion to clarify**

After summary judgment briefing concluded, Williams filed a "motion to clarify" the timing of the incident. Dkt. 114. The defendants did not respond. Because the body-worn camera footage timestamps were unavailable, Williams estimated the time of the incident as beginning around 7:38–7:40 a.m. The statement is consistent with Williams's other statements, and the time estimate clarifies Williams's perception of events in relation to the incident reports. The motion was filed in the form of a declaration made under penalty of perjury. I will grant the motion to clarify and consider Williams's submission.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Javon Williams is a Wisconsin prisoner incarcerated at Colombia Correctional Institution (CCI). Williams has a history of mental health problems and self-harm.

Defendants Rebecca Young, Bowyn Wilson and Nicholas Roen are correctional officers working at CCI. Defendant Brittany Hibma is a sergeant at CCI who was working in the "bubble," the central security hub, for the restrictive housing unit where Williams was housed. Defendant Shane Hinton is a CCI captain and was defendant Hibma's supervising officer. Defendant Gina Strehlow is a nurse employed by a private company under a contract with the Department of Corrections. Strehlow assessed Williams before he was sent to the hospital.

Williams obtained approximately 50 tablets of Benadryl and amitriptyline, an antidepressant, from another inmate. Officer Rebecca Young was conducting security rounds on Williams's floor. Williams states that he showed the pills to defendant Young, told her that he was about to overdose on the pills, offered to give the pills to her, and only then slowly swallowed the pills over the course of about five minutes. Williams says that Young did not radio for backup until long after he had finished swallowing the pills. Young disputes this, saying that Williams swallowed a handful of pills before she could react and that she called for help immediately.

While Young was at the cell, Sergeant Hibma was stationed in the central control bubble. Hibma received two radio calls. In the first call, according to Hibma, she was told only that Williams had threatened self-harm, not that he overdosed on pills. Williams disputes this, contending that Hibma knew from the onset that he had overdosed. Hibma directed Officers Wilson and Roen to move Williams to a programming cell for observation. They did so.

Williams says he took more pills in the programming cell after he showed them to the officers. Hibma says she received the second radio and learned that Williams had ingested pills after she had sent Roen and Wilson to move Williams to the programming cell. After getting the second call, she contacted the Health Services Unit (HSU) and her supervisor, Captain Hinton. Captain Hinton and other officers periodically checked on Williams in the observation cell until he was seen by Nurse Strehlow.

Strehlow, after consulting with the on-call doctor, told Hinton that Williams would be sent off-site for evaluation, but that an ambulance was not necessary. It took about 30 minutes for the transport team to arrive to take him to the hospital in a state van. When Williams arrived in the emergency department, he was initially unconscious, but some reports indicate that he could be roused. Williams was intubated, sedated, and given medication to protect his heart. After a few hours, Williams was admitted to the ICU, where he remained under observation until the next morning. All Williams remembers about his treatment at the hospital was waking up in the hospital the next day. After he was discharged, he complained of vomiting, dizziness, headaches, and scratches from the restraints.

Further facts will be addressed in the analysis section.

## ANALYSIS

Williams brings three categories of claims against defendants. First, Williams brings Eighth Amendment failure to protect claims against correctional officers Young, Roen, and Wilson for failing to prevent his overdose. Second, Williams brings Eighth Amendment inadequate medical care claims against Seargent Hibma, Captain Hinton, and Nurse Strehlow for delaying his eventual treatment in the hospital. Williams contends that Strehlow failed to

administer activated charcoal and falsified her medical records. Third, Williams contends that all defendants were negligent under state law based on the same actions.

### A. Eighth Amendment failure-to-protect claims

Williams contends that Young, Roen, and Wilson failed to prevent him from overdosing. This claim is governed by the Eighth Amendment, which prohibits prison officials from consciously disregarding serious risks to a prisoner's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on his claim, Williams must show four things: (1) there was a strong likelihood that Williams would seriously harm himself; (2) defendants knew of a strong likelihood that he would seriously harm himself; (3) defendants consciously failed to take reasonable measures to prevent the harm; and (4) defendants' actions or inactions caused him harm. *See Lord v. Beahm*, 952 F.3d 902, 904–05 (7th Cir. 2020); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012)

#### 1. Young

Williams argues that defendant Young consciously disregarded a serious risk of harm by doing nothing when Williams told her that he was going to overdose, by not taking the pills when Williams offered them up, and by silently watching as Williams slowly ingested the pills. Young and Williams dispute what happened, and the body-worn camera footage of this interaction was not preserved. Williams states in his declaration that he "slowly overdosed" on the pills for upwards of five minutes after he told Young that he was going to overdose. The declarations of the inmates near Williams also state that Williams told Young he would overdose, offered her the pills, and then slowly took the pills while Young watched without calling for immediate help. Dkt. 101 and Dkt. 102. Young states that Williams did not offer

her the pills but rather threw them all into his mouth before she had time to react. She states that she immediately radioed for backup.

At summary judgment, I must construe all admissible evidence in favor of the non-moving party, so I will accept Williams's version of events. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A reasonable jury could infer that Young knew there was a strong likelihood that Williams would harm himself based on Williams's statement that he held the pills out and told her that he intended to overdose, and that she would have had time to intervene while he slowly took the pills over the course of five minutes.

It's undisputed that Young didn't try to intervene or call for help until Williams had taken the pills, and there is a material dispute as to whether Young had enough time to take reasonable preventative action.

Defendants argue that Young is entitled to summary judgment on the basis of qualified immunity. Qualified immunity generally protects government officials from liability for civil damages so long as they do not violate clearly established constitutional rights. *Estate of Clark v. Walker*, 865 F.3d 544, 550–51 (7th Cir. 2017). But it's not appropriate to apply qualified immunity when the basic facts are disputed, because in such cases the merits question and the qualified immunity analysis "effectively collapse into one." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). A reasonable jury could find that Young consciously disregarded a known harm to Williams's safety, thereby violating Williams's clearly established Eighth Amendment rights. I will deny summary judgment as to defendant Young and the claim against her will proceed to trial.

### 2. Roen and Wilson

Williams contends that Roen and Wilson failed to protect him when they transferred him to an unsupervised programming cell and knowingly left him alone with more pills. Williams states that he told the defendants he had taken "a lot of Benadryl and Amitriptyline" and then offered "to give the rest of the pills I had" to Roen and Wilson but that they "ignored me as well, so when they left the programming room, I took more and fainted on the floor." Dkt. 98 ¶¶ 18–19. Accepting Williams's version of events, Roen and Wilson knew Williams had taken a large number of pills. They saw him offer additional pills to them, and did nothing, leaving Wiliams in the cell alone with the pills, which he continued to take. I can infer that ingesting additional pills would have worsened the effects by increasing the dose.

Defendants argue that Roen and Wilson were "not aware of what pills Williams had taken, nor were they aware of any imminent threat." Dkt. 90 at 6. They point to Hibma's declaration, which states that she told Roen and Wilson that Williams had threatened self-harm and needed a psychiatric consult, but not that he had taken any pills. But officer Roen's incident report indicates that he knew that Williams had told Young he "had swallowed a bunch of pills." Dkt. 95-4 at 2. Roen also reported that Williams showed them two of the capsules. There is no evidence that they confiscated the pills or took any preventative action before they left Williams alone, after he had already overdosed, with more of the same pills.

There is a genuine dispute as to whether Roen and Wilson were aware of the pills when they left Williams alone in the cell. I decline to apply qualified immunity to Roen and Wilson for the same reason I declined to apply it to Young. I will deny summary judgment to Roen and Wilson on the claims against them.

**B. Eighth Amendment medical care claims**

Williams also brings Eighth Amendment medical care claims against Hibma, Hinton and Strehlow. He argues that Hibma consciously disregarded his medical needs by directing Roen and Wilson to leave him alone in a programming cell, that Hinton delayed his medical care, and that Strehlow delayed his medical care, falsified her records to justify the delay, and failed to provide activated charcoal.

The Eighth Amendment prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). Defendant Strehlow contests whether Williams's consumption of pills qualifies as a "serious medical need," because Williams has not provided expert testimony to support his claim. Dkt. 82 at 11. However, the doctors involved recognized that Williams needed treatment: the on-call physician ordered that Williams be sent for evaluation, where he was intubated and given medication to prevent damage to his heart. Williams had a serious medical need that doctors recognized as needing treatment.

A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice do not amount to conscious disregard. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

An inexplicable delay in treatment may constitute conscious disregard. *Petties v. Carter,* 538 F.3d 763, 730 (7th Cir. 2007). However, delay alone is insufficient: a plaintiff must provide "independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Id.* at 730–31. Evidence of a plaintiff's diagnosis and treatment alone is insufficient if it would not aid the jury in determining whether the delay further harmed him. *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

**1. Hibma**

Williams contends that sergeant Hibma disregarded his medical needs by ordering Roen and Wilson to leave Williams alone in a programming cell, even though Williams had already overdosed. Both parties agree that defendant Hibma was in the restrictive housing unit's central bubble during the events of the case and could not leave. Williams argues that Hibma knew that Williams had overdosed when she first ordered Roen and Wilson to collect Williams and leave him alone in a programming cell for observation.

Hibma states that she received two calls that morning. The first call informed her only that Williams had threatened self-harm and said nothing about attempted self-harm or an overdose on pills. Williams argues that it must have been Young who radioed Hibma, and therefore, Hibma must have known he had taken pills because Young told her. Dkt. 99, ¶ 31. Williams cites Young's declaration, which states that she described Williams as taking "a lot of pills" when she radioed for backup. Dkt. 42, ¶ 16. A reasonable jury could infer that the call Hibma received was Young's call describing pills. But the dispute is ultimately immaterial because the evidence does not show that Hibma consciously disregarded Williams's condition.

No evidence shows that Hibma knew that Williams still had pills when she sent Roen and Wilson to put him in observation. Rather, the evidence shows that she responded by

ordering observation, contacting her supervisor, and notifying HSU. Her decision to put an inmate on observation status is not inappropriate if she was unaware that there was continuing harm. Williams must show that each defendant was personally responsible for each claim. *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023). If Hibma didn't know that Williams still had pills, she could not consciously disregard the risk that he would continue to take the pills. Hibma could not leave the bubble, so she was relying on Hinton and nursing staff to handle the crisis after she radioed them. Prisons are bureaucracies and inmates are "not entitled to insist that one employee do another's job." *Burks v. Raemisch,* 555 F.3d 592, 595 (7th Cir. 2009).

I will grant summary judgment as to the claim against Hibma.

**2. Hinton**

Williams's only claim against Captain Hinton is that Hinton got mad and delayed medical care after Williams began to lose consciousness. Williams argues that, because of the delay caused by Hinton, he did not make it to the hospital until after 1:00 pm. Dkt. 97 at 6. It isn't clear exactly when Williams contends Hinton caused delay, but I have identified two possibilities. First, the delay could refer to the period of time when Hinton failed to order an ambulance for Williams and instead arranged for van transport. Second, the delay could refer to the approximately 30-minute gap between the order for Willams to be sent to the hospital and the transport team arriving to take him.

The first potential delay occurred when Hinton did not order an ambulance for Williams. Hinton's actions are all recorded in his body-worn camera footage. At around 8:00 a.m., Hinton learned that Williams had taken pills. While waiting for a nurse to assess Williams, Hinton covered security rounds and the officers took Williams to the programming

cell. Within a half hour, Hinton helped the officers move Williams to an HSU room where he would see Nurse Strehlow. Strehlow told Hinton that the on-call physician ordered that Williams should be sent to the hospital, but that he could be sent in a van. Hinton did not override the doctor's orders. Instead of ordering an ambulance, Hinton arranged transportation by prison staff. Williams contends that, because he was unconscious, Hinton should have called for the ambulance. But the evidence shows that Williams was awake and alert up to the point that he was wheeled out of the building. Dkt 95-3 at 47:17–35.

Hinton's failure to order an ambulance did not violate the Eighth Amendment. Hinton was relying on the medical advice of nurse Strehlow and the on-call physician when he arranged transport. Hinton did not violate the Eighth Amendment by deferring to the advice of medical professionals. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012.)

The second potential delay is the 30-minute gap between the order for Willams to be sent to the hospital and the transport team arriving to take him. Hinton had to make several calls to arrange for the transportation van and to adjust guard duties to account for the three officers that would accompany Williams to the hospital. During that half hour, Hinton also checked on Williams in the observation cell every 15 minutes until the transport team arrived.

Hinton was actively addressing Williams's needs during the period that he waited for transportation. Hinton ensured that Williams was seen by the nurse and then followed the nurse and the on-call physician's medical advice as to transportation. Hinton arranged transportation and checked on Williams until transportation arrived. Williams states that Hinton didn't conduct observation checks. Dkt 98, ¶ 29. But the video shows Hinton returning twice to briefly look into the programming cell window. Dkt. 95-3 at 25:20–30; 35:35–45.

Because Williams's allegation is clearly contradicted by the evidence, it cannot forestall summary judgment. *Scott v Harris*, 550 U.S. 372, 380 (2007).

Williams contends that the delay was inexplicably long because he did not arrive at the hospital until after 1:00 p.m. Williams is mistaken about the time he arrived at the hospital. Williams was transferred from the hospital emergency department to the ICU shortly after 1:00 p.m. Dkt. 4-7 at 2. But he arrived at the emergency room much earlier. The footage shows that Williams wheeled out of the building around 9:15 a.m. and he arrived at the hospital shortly thereafter. *Id.*; Dkt. 95-3. There was no inexplicably long delay.

I will grant summary judgment to Hinton on the claim against him.

**3. Strehlow**

I granted Williams leave to proceed on three Eighth Amendment claims: (1) Strehlow delayed his medical care by ordering that he be sent to the hospital via van, rather than through EMS or an ambulance; (2) she falsified her records to justify that decision and prevent the on-call physician from learning that Williams was unconscious; and (3) she failed to give him activated charcoal to treat the overdose.

**a. Delaying medical care**

I begin with the claim that Strehlow delayed his medical treatment by ordering Williams to be sent to the hospital by state van, rather than by ambulance. But that was not Strehlow's decision. Rather, Strehlow called the on-call physician, who ordered that Williams should be sent offsite for evaluation and could be sent by van. Dkt. 83, ¶ 3. Strehlow followed the directive given by the physician. Once the doctor had made the order, nurses like Strehlow only violate the Constitution by failing to intervene if it is obvious that a treatment is blatantly inappropriate or will cause harm *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015).

**b. Falsifying medical records**

Williams's second claim is that Strehlow falsified her records to hide the fact that he was unconscious when Strehlow called the physician. He contends that, in falsifying these records, she misled the on-call physician into believing that an ambulance was unnecessary. Williams points to two alleged falsities: (1) her observation that Williams was responding to stimuli and awake, and (2) her omission of the fact that Williams was unconscious and placed in a restraint chair when he left the building.

First, Williams disputes Strehlow's observation that Williams pushed her hand away and said "awww, damn" when she tested pain response. Strehlow's notes reflect that Williams was sitting up, awake, but closing his eyes. She wrote that Williams resisted opening his eyes and responded to stimuli by pushing her hand away and saying "awww, damn." Dkt. 98-3. Williams argues that this must be false because he was unconscious and therefore could not have responded.

Strehlow's assessment is confirmed by Hinton's body-worn camera footage. The video shows that, while Strehlow was assessing Williams, he was awake, alert, and able to get up and walk with officer assistance. The video also shows that he sat up and looked around as Strehlow examined him. Dkt 95-3 at 16:49–18:29. Contrary to Williams's account, the video evidence establishes that, at the time Strehlow assessed Williams, he was not unconscious or in a coma. Williams's contention that Strehlow falsified records to hide the fact that Williams was unconscious is refuted by the record and cannot establish a genuine dispute of fact. *See Scott*, 550 U.S. at 380.

Second, Williams disputes Strehlow's failure to indicate to the doctor or in her notes that Williams was placed in a restraint chair as he was being transported from the building

because he was unconscious. Hinton's video shows that Williams was limp as he was being placed into the chair, and that Nurse Strehlow was watching from nearby. Dkt. 95-3 at 46:48–53:01. However, Strehlow's omission of this information is immaterial because by the time Williams lost consciousness, the officers were actively taking him to the hospital. At that time, calling an ambulance would have only delayed his transportation. Failing to include the observation that Williams was in a restraint chair did harm Williams because he was already being taken to the hospital.

**c. Failing to provide activated charcoal**

Williams's third claim is that Strehlow consciously disregarded his medical needs by failing to provide him with activated charcoal. Charcoal is commonly administered in poisoning cases to absorb harmful substances. *See Activated Charcoal: An Effective Treatment for Poisonings*, NAT'L CAP. POISON CTR., https://www.poison.org/articles/activated-charcoal (last visited Nov. 9, 2026).

There is some evidence that charcoal could have been a potentially beneficial treatment for Williams. After Williams was sent to the hospital, the emergency department consulted the ICU about treatment options. The ICU physician noted: "It may be too late for benefit with activated charcoal." Dkt. 103-3 at 27. So, emergency room staff did not order charcoal. The note does not specifically reflect that prison staff should have given charcoal, or that the lack of charcoal would require additional interventions. But I can infer that, had they seen Williams sooner, they might have administered it.

But to show conscious disregard, the plaintiff must point to evidence that shows more than a mere error or disagreement among medical providers. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *Sewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021).

Williams contends that a nursing protocol required Strehlow to administer charcoal. Failing to follow an existing protocol might be evidence that a defendant nurse has violated the Eighth Amendment. *Petties*, 836 F.3d at 729. But Williams doesn't provide any evidence that Strehlow deviated from a protocol. Williams cites a prison staff member's response to Williams asking if charcoal was available to Strehlow. That response stated that suspended charcoal was available for nurses to administer "based on provider order or nurse protocol." Dkt 103-6 at 2. But Williams has not submitted the protocol as evidence, nor does he adduce any evidence that Strehlow deviated from the protocol by not administering it to him.

Williams has not adduced evidence that a nursing protocol required Strehlow to administer activated charcoal in this situation, or that her failure to do so somehow fell so far below the standard of care as to be "a substantial departure from accepted professional judgment" as to violate the Eighth Amendment. *Roe*, 631 F.3d at 857. The evidence shows only that activated charcoal was an available option. Given the other treatment provided by Strehlow, no reasonable jury could find that Strehlow consciously disregarded Williams's medical needs.

I will grant summary judgment to Strehlow on the Eighth Amendment claims against her.

**C. State negligence claims**

Williams also asserts state-law negligence claims against each defendant. Under Wisconsin state law, all claims of negligence, including medical negligence, have the same four elements: (1) a duty, (2) a breach of that duty, (3) causation, and (4) injury or damages. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 5 N.W.2d 860. As explained below, Williams has established a material dispute of fact as to the claims against Young, Roen,

Wilson, and Strehlow, so I will deny summary judgment as to those claims. But Williams has not adduced evidence that shows that Hinton and Hibma were negligent, so I will grant summary judgment to them.

**a. Young, Roen, and Wilson**

The state negligence claims against Young, Roen and Wilson will go forward for the same reasons as the Eighth Amendment failure-to-protect claims. Prison officials have a duty to take reasonable measures to protect inmates from suicide and self-harm. A reasonable jury could find that Young breached that duty when she failed to take reasonable actions to prevent Williams from ingesting pills. A reasonable jury could find that Wilson and Roen breached that duty when they failed to take the remaining pills away from Williams before leaving him alone in the programming cell.

Defendants argue that Young, Roen, and Wilson are entitled to discretionary immunity. Wisconsin law grants immunity to public officials for discretionary acts taken within the scope of their employment. Discretionary acts are protected; the performance of failure to perform ministerial duties is not. Wis. Stat. § 89.80(4); *Pries v. McMillon*, 2008 WI App 167, ¶ 15, 314 Wis. 2d 706, 760 N.W.2d 174. Where discretionary acts involve judgment calls, ministerial duties are limited to those that are "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion. . . ." *Id.*, ¶ 17.

But officials are not granted immunity for discretionary conduct that is "malicious, willful, and intentional." *Engelhardt v. City of New Berlin*, 2019 WI 2, ¶ 29, 285 Wis. 2d 86, 921 N.W.2d 714. I concluded above that a reasonable jury could find that Young, Roen, and Wilson consciously disregarded the risk that Williams would attempt to overdose and failed to

take any reasonable measures to prevent Williams from consuming the pills. So the question of malice, willfulness, and intent is for the jury to resolve. *See Price ex rel. J.K. v. Mueller-Owens*, No. 19-cv-854-bbc, 516 F. Supp. 3d 816, 831 (W.D. Wis. 2021); *Gorins v. Dohms*, No. 25-cv-294-jdp, 2026 WL 1006191, at * 2; *Est. of Fiebrink by Cade v. Armor Corr. Health Servs., Inc.*, No. 18-cv-832, 2019 WL 1980625, at *13 (E.D. Wis. May 3, 2019).

**b. Hibma and Hinton**

Williams's negligence claim against Hibma fails for the same reasons as his Eighth Amendment claim. Hibma was not sufficiently involved in Williams's treatment. She played the role as a command center operator, who delegated Williams's care to others. She did not breach a duty of care, nor were her actions a cause of Williams's injury. The negligence claim against Hinton also fails for the same reason as the Eighth Amendment claims. There is simply no evidence that his actions harmed Williams. Causation and actual harm are both required elements to prove a negligence claim against a medical provider. *Skemp*, 2001 WI 42, ¶ 17. Williams doesn't explain what, if anything, Hinton's actions did to worsen his condition or cause him additional harm.

**c. Strehlow**

The claims against Strehlow alleging delay and falsifying records also fail because Williams was not harmed by those actions.

But Strehlow's failure to administer activated charcoal while Williams was still at the prison presents a thornier question. By the time Williams arrived at the hospital, the doctors believed that "[i]t may be too late for benefit with activated charcoal." Dkt. 103-3 at 27. Wisconsin law defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which

he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999); *Schuster v. Altenberg,* 144 Wis. 2d 223, 229, 424 N.W.2d 159, 161–62 (1988). If this evidence is interpreted in Williams's favor, it suggests that other medical providers would have administered charcoal if they had seen him earlier, and that it could have benefitted him.

Generally, Wisconsin medical negligence claims require expert testimony. *Carney-Hayes v. Northwest Wis. Home. Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 254. Strehlow argues that Williams has not submitted notice of any medical experts, which should preclude his medical negligence claim. However, Strehlow has noticed several witnesses that she intends to call. Dkt. 74. She notices herself as a potential expert witness. Plaintiffs are permitted to rely on the expert testimony of a defendant medical provider to establish the standard of care. *Gil v. Reed*, 381 F.3d 649, 660 (7th Cir. 2004). Williams has not provided notice of any expert testimony, but there is medical evidence in the record suggesting that charcoal was a potentially effective treatment given Williams's symptoms. Williams will be able to cross-examine Strehlow and call as adverse witnesses any of the emergency room physicians that Strehlow has disclosed.

There is a genuine dispute of material dispute of fact and Williams is entitled to have his medical negligence claim decided by a jury.

**D. Request for counsel**

Williams has asked that the court appoint him counsel under 28 U.S.C. § 1915(e). Dkt. 113. While I do not have the authority to appoint counsel for Williams, I have discretion to recruit counsel. *Pruitt v. Mote,* 503 F.3d 647, 649 (7th Cir, 2007). Williams must meet three requirements to obtain court assistance in recruiting counsel. *Santiago v. Walls*, 599 F.3d 749,

760–61 (7th Cir. 2010). First, he must show that he is unable to afford counsel. Williams is proceeding in forma pauperis without prepaying the full filing fee. Dkt. 7. Williams is therefore indigent and unable to afford counsel.

Second, he must show that he has made reasonable efforts on his own to find a lawyer to represent him. To meet the second requirement, this court generally requires plaintiffs to submit letters from at least three attorneys to whom they have written and who have refused to take the case. Williams has contacted three attorneys who have declined to represent him. Dkt. 110-1.

Third, Williams must show that his case is one of the relatively few cases in which it appears that the legal and factual difficulty of the case will exceed his ability to litigate it. *Pruitt,* 503 F.3d at 654–55. "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff" but instead whether the pro se plaintiff can "coherently present [his case] to the judge or jury himself." *Id.* at 655.

Williams does not meet this requirement. Between this case, and the others he has brought before this court, he has consistently proven himself competent to litigate cases involving multiple defendants and has progressed past the summary judgment stage without assistance. The court must decide for each case "whether this particular prisoner-plaintiff, among many deserving and not-so-deserving others, should be the beneficiary of the limited resources of lawyers willing to respond to courts' requests." *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring). This case does not warrant the use of a volunteer lawyer. Williams's negligence claims will likely involve some medical testimony, but he can adduce that evidence through cross-examination. I will provide instructions to assist

Williams in these and other tasks at trial. I will deny Williams's request for assistance in recruiting counsel.

## CONCLUSION

Williams has provided evidence that, if believed, would allow a jury to find that Young, Roen and Wilson consciously disregarded a serious risk of self-harm when they failed to take reasonable measures to prevent Williams's overdose. The evidence also would allow a jury to conclude that they were negligent under state law for the same conduct. Likewise, the evidence presented would allow a jury to believe that Nurse Strehlow breached her nursing duty of care by failing to administer activated charcoal. The case will proceed to trial on those claims. I will follow this order with a trial preparation order that will include specific instructions about how Williams's should prepare and present his claims at trial.

## ORDER

IT IS ORDERED that:

1. Plaintiff's motion for spoliation sanctions, Dkt. 61, is DENIED in part and GRANTED in part as provided above.

2. Plaintiff's motion for clarification, Dkt. 114, is GRANTED.

3. The defendants' motion for summary judgment, Dkt. 89, is DENIED with respect to plaintiff's claims against Young, Roen, and Wilson; the motion is GRANTED with respect to the claims against defendants Hibma and Hinton.

4. Defendant Strehlow's motion for summary judgment, Dkt. 81, is DENIED with respect to plaintiff's state-law medical negligence claims; the motion is GRANTED with respect to plaintiff's Eighth Amendment claims.

5. Defendants Hibma and Hinton are DISMISSED from the case.

6. Plaintiff's motion to recruit counsel, Dkt. 113, is DENIED.

Entered November 9, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge